Filed 12/27/12

# IN THE SUPREME COURT OF CALIFORNIA

RALPHS GROCERY COMPANY, )
 )
  Plaintiff and Appellant, )
 )   S185544
 v. )
 )  Ct.App. 3 C060413
UNITED FOOD AND COMMERCIAL )
WORKERS UNION LOCAL 8, )  Sacramento County
 )  Super. Ct. No. 34-2008-
  Defendant and Respondent. )  00008682-CU-OR-GDS
_____)

A supermarket owner sought a court injunction to prevent a labor union from picketing on the privately owned walkway in front of the only customer entrance to its store. In response, the union argued that two statutory provisions — Code of Civil Procedure section 527.3 (the Moscone Act) and Labor Code section 1138.1 (section 1138.1) — prohibited issuance of an injunction under these circumstances. The trial court denied relief, ruling that the supermarket owner had failed to satisfy section 1138.1's requirements for obtaining an injunction against labor picketing.

The Court of Appeal reversed. It held that the walkway fronting the supermarket's entrance was not a public forum under the California Constitution's provision protecting liberty of speech (Cal. Const., art. I, § 2, subd. (a)), and therefore the store owner could regulate speech in that area. It further held that both the Moscone Act and section 1138.1, because they give speech regarding a labor dispute greater protection than speech on other subjects, violate the free

1

speech guarantee of the federal Constitution's First Amendment and the equal protection guarantee of the federal Constitution's Fourteenth Amendment. This court granted the union's petition for review.

We agree with the Court of Appeal that the supermarket's privately owned entrance area is not a public forum under the California Constitution's liberty of speech provision. For this reason, a union's picketing activities in such a location do not have state *constitutional* protection. Those picketing activities do have *statutory* protection, however, under the Moscone Act and section 1138.1. We do not agree with the Court of Appeal that the Moscone Act and section 1138.1, which are components of a state statutory system for regulating labor relations, and which are modeled on federal law, run afoul of the federal constitutional prohibition on content discrimination in speech regulations. On this basis, we reverse the Court of Appeal's judgment and remand the matter for further proceedings.

## I. FACTS

Plaintiff Ralphs Grocery Company (Ralphs) owns and operates warehouse grocery stores under the name "Foods Co." One such store is located in a retail development in Sacramento called College Square, which also contains restaurants and other stores. The College Square Foods Co store has only one entrance for customers. A paved walkway around 15 feet wide extends outward from the building's south side, where the customer entrance is located, to a driving lane that separates the walkway from the store's parking lot, which also serves customers of other retail establishments within College Square.

When the College Square Foods Co store opened in July 2007, agents of defendant United Food and Commercial Workers Union Local 8 (the Union) began picketing the store, encouraging people not to shop there because the store's employees were not represented by a union and did not have a collective

2

bargaining agreement. The Union's agents, in numbers varying between four and eight, walked back and forth on the entrance walkway carrying picket signs, speaking to customers, and handing out flyers. These activities generally occurred five days a week (Wednesday through Sunday) for eight hours a day. The Union's agents did not impede customer access to the store.

In January 2008, Ralphs notified the Union in writing of its regulations for speech at its Foods Co stores, including the one in College Square. Those store regulations prohibit speech activities within 20 feet of the store's entrance and prohibit all such activities during specified hours and for a week before certain designated holidays. The store regulations also prohibit physical contact with any person, the distribution of literature, and the display of any sign larger than two feet by three feet. The Union's agents did not adhere to Ralphs's speech regulations. In particular, they handed out flyers and stood within five feet of the store's entrance. Ralphs asked the Sacramento Police Department to remove the Union's agents from the College Square Foods Co store, but the police declined to do so without a court order.

In April 2008, Ralphs filed a complaint in Sacramento County Superior Court alleging that the Union's agents, by using the walkway fronting the College Square Foods Co store as a forum for expressive activity without complying with Ralphs's speech regulations, were trespassing on its property. Among other forms of relief, Ralphs sought a temporary restraining order, a preliminary injunction, and a permanent injunction barring the Union's agents from using the College Square Foods Co store property to express their views without complying with Ralphs's regulations prohibiting certain speech activities on its property.

Although the trial court denied Ralphs's request for a temporary restraining order, it issued an order to show cause and set an evidentiary hearing on the application for a preliminary injunction. In response, the Union argued that the

3

Moscone Act, as construed by this court in *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters* (1979) 25 Cal.3d 317 (*Sears*), barred the court from enjoining peaceful picketing on a privately owned walkway in front of a retail store entrance during a labor dispute, and that Ralphs was not able to satisfy section 1138.1's procedural requirements for injunctions against union picketing.

On May 28, 2008, the trial court ruled that the Moscone Act violates the federal Constitution's First and Fourteenth Amendments because it favors labor speech over speech on other subjects. In reaching that conclusion, the trial court found persuasive the reasoning of the federal Court of Appeals for the District of Columbia Circuit in *Waremart Foods v. N.L.R.B.* (D.C. Cir. 2004) 354 F.3d 870 (*Waremart/N.L.R.B.*). Regarding section 1138.1, the trial court said it would have found that statute to be unconstitutional as well had it not considered itself bound by a California Court of Appeal's decision, *Waremart Foods v. United Food & Commercial Workers Union* (2001) 87 Cal.App.4th 145 (*Waremart/United Food*), which held that section 1138.1 does *not* violate the federal or state constitutional equal protection guarantees. (*Waremart/United Food* was decided by the Third District Court of Appeal, which also decided this case.) The trial court ordered that an evidentiary hearing be held under section 1138.1 to determine whether Ralphs was entitled to the requested injunctive relief.

After conducting the evidentiary hearing, the trial court denied Ralphs's motion for a preliminary injunction. The court found that Ralphs had "failed to introduce evidence sufficient to carry its burden on any of the factors enumerated in section 1138.1." In particular, the court found that "[t]he evidence did not establish that the Union had committed any unlawful act, or that it had threatened to do so," or "that anything the [Union picketers were] doing would cause any 'substantial and irreparable injury' to the store property, or that public officers were unable or unwilling to furnish adequate protection to plaintiff's property."

4

The court also found that Ralphs had "failed to carry its burden of proof that its rules are reasonable time, place and manner restrictions within the guidelines of *Fashion Valley Mall, LLC v. NLRB* (2007) 42 Cal.4th 850." Ralphs appealed.

The Court of Appeal reversed and remanded the matter to the trial court with instructions to grant the preliminary injunction. The Court of Appeal stated that "the entrance area and apron" of the Foods Co store "were not designed and presented to the public as public meeting places," and therefore did not constitute a public forum under the state Constitution's liberty of speech provision. Because these areas did not constitute a public forum, the court concluded, Ralphs "could limit the speech allowed and could exclude anyone desiring to engage in prohibited speech." The Court of Appeal also concluded that both the Moscone Act and section 1138.1, because they give speech about labor disputes greater protection than speech on other issues, violate the federal Constitution's First and Fourteenth Amendments. The Court of Appeal acknowledged that, as to section 1138.1, it had reached a contrary result in *Waremart/United Food*, *supra*, 87 Cal.App.4th 145, but it said it had there "applied the rational relationship test because the plaintiff made no argument and presented no authority to apply the strict scrutiny test."

This court granted the Union's petition for review.

## II. DISCUSSION

### A. Public Forum Under the State Constitution

The California Constitution states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Cal. Const., art. I, § 2, subd. (a).) It also guarantees the rights to "petition government for redress of grievances" and to "assemble freely to consult for the common

5

good." (*Id.*, art. I, § 3, subd. (a).) Through these provisions, this court has held, our state Constitution protects speech in privately owned shopping centers. (*Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 910 (*Pruneyard*).) A privately owned shopping center may constitute a public forum under the state Constitution because of "the growing importance of the shopping center" (*Pruneyard*, at p. 907) " 'as a place for large groups of citizens to congregate' " and "to take advantage of the numerous amenities offered" there, and also because of " ' "the public character of the shopping center," ' " which is a result of the shopping center's owner having " ' "fully opened his property to the public" ' " (*id.* at p. 910 & fn. 5).

This court in *Pruneyard* stressed that "those who wish to disseminate ideas" in shopping centers do not "have free rein." (*Pruneyard*, *supra*, 23 Cal.3d at p. 910.) *Pruneyard* approvingly quoted the following remarks made by Justice Mosk in an earlier case: " 'It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment. As a result of advertising and the lure of a congenial environment, 25,000 persons are induced to congregate daily to take advantage of the numerous amenities offered by the [shopping center there]. A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant [shopping center] to assure that these activities do not interfere with normal business operations [citation] would not markedly dilute defendant's property rights.' " (*Pruneyard*, at pp. 910-911, quoting *Diamond v. Bland* (1974) 11 Cal.3d 331, 345 (dis. opn. of Mosk, J.).)

Our reasoning in *Pruneyard* determines the scope of that decision's application. That reasoning is most apt in regard to shopping centers' common areas, which generally have seating and other amenities producing a congenial

6

environment that encourages passing shoppers to stop and linger, to leisurely congregate for purposes of relaxation and conversation. By contrast, areas immediately adjacent to the entrances of individual stores typically lack seating and are not designed to promote relaxation and socializing. Instead, those areas serve utilitarian purposes of facilitating customers' entrance to and exit from the stores and also, from the stores' perspective, advertising the goods and services available within. Soliciting signatures on initiative petitions, distributing handbills, and similar expressive activities pose a significantly greater risk of interfering with normal business operations when those activities are conducted in close proximity to the entrances and exits of individual stores rather than in the less heavily trafficked and more congenial common areas. Therefore, within a shopping center or mall, the areas outside individual stores' customer entrances and exits, at least as typically configured and furnished, are not public forums under this court's decision in *Pruneyard*, *supra*, 23 Cal.3d 899.

Our conclusion is consistent with decisions by California's intermediate appellate courts. We consider here, as examples, the decisions in *Albertson's, Inc. v. Young* (2003) 107 Cal.App.4th 106 (*Albertson's*) and in *Van v. Target Corp.* (2007) 155 Cal.App.4th 1375 (*Van*).

*Albertson's* concerned a supermarket in a Nevada County shopping center called Fowler Center, between Grass Valley and Nevada City. (*Albertson's*, *supra*, 107 Cal.App.4th 106, 110.) The supermarket's owner sued six individuals who, for the purpose of gathering signatures on voter initiative petitions, had stationed themselves on the walkway immediately outside the supermarket's entrances. The supermarket owner sought injunctive and declaratory relief to stop this expressive activity. The trial court granted an injunction barring the defendants from coming onto the store's premises to solicit signatures on initiative petitions. (*Id.* at p. 109.) The Court of Appeal affirmed, concluding that under the

7

state Constitution the walkway in front of the supermarket entrance was not a public forum. (*Id.* at p. 110.) It remarked that the grocery store "does not invite the public to meet friends, to eat, to rest, to congregate, or to be entertained at its premises" (*id.* at p. 120), nor was the store or its entrance area "a place where people choose to come and meet and talk and spend time" (*id.* at p. 121).

In *Van*, two individuals brought class action lawsuits against Target Corporation, Wal-Mart Stores, Inc., and Home Depot, U.S.A., Inc., alleging that the defendant store owners had unlawfully prevented them from gathering signatures in front of their stores, many of which were in shopping centers. (*Van*, *supra*, 155 Cal.App.4th 1375*, 1378-1379.) The plaintiffs sued as representatives of "a class of individuals who gather voter signatures for initiatives, referenda and recalls and register voters for upcoming elections." (*Id.* at p. 1379.) They sought damages as well as declaratory, equitable, and injunctive relief. (*Ibid.*) The trial court denied relief, concluding that the areas in front of the entrances to individual stores located within shopping centers are not public forums for purposes of the state Constitution's liberty of speech provision. (*Id.* at p. 1381.)

The Court of Appeal in *Van* affirmed. It concluded that "neither respondents' stores themselves nor the apron and perimeter areas of the stores were comprised of courtyards, plazas or other places designed to encourage patrons to spend time together or be entertained." (*Van*, *supra*, 155 Cal.App.4th at pp. 1388-1389.) The court added that "the evidence showed that the stores are uniformly designed to encourage shopping as opposed to meeting friends, congregating or lingering." (*Id.* at p. 1389.) The court concluded that the entrance and exit areas of the stores in question, which were located within shopping centers, "lacked any public forum attributes." (*Id.* at p. 1391.)

We agree with these intermediate appellate decisions that to be a public forum under our state Constitution's liberty-of-speech provision, an area within a

8

shopping center must be designed and furnished in a way that induces shoppers to congregate for purposes of entertainment, relaxation, or conversation, and not merely to walk to or from a parking area, or to walk from one store to another, or to view a store's merchandise and advertising displays.

That conclusion does not dispose of this case, however. We consider next the extent to which state labor law, and particularly the Moscone Act and section 1138.1, protect labor speech on private land in front of a business that is the subject of a labor dispute.

**B. California's Moscone Act and Section 1138.1**

First, we review the language of those statutes. Next, we consider the extent to which they apply to labor picketing on private property in front of doorways used by customers to enter and exit a retail store. Finally, we review the Court of Appeal's conclusion here that, because they give speech regarding labor disputes greater protection than speech on other topics, the Moscone Act and section 1138.1 violate the federal Constitution's First and Fourteenth Amendments. As we explain, we disagree with the Court of Appeal on that point.

*1. The Moscone Act*

The California Legislature enacted the Moscone Act in 1975. (Stats. 1975, ch. 1156, § 2, p. 2845.) It was patterned after section 104 of title 29 of the United States Code, a federal statute that is part of the Norris-LaGuardia Act (29 U.S.C. §§ 101-115), which the United States Congress enacted in 1932. The stated purpose of California's Moscone Act is "to promote the rights of workers to engage in concerted activities for the purpose of collective bargaining, picketing or other mutual aid or protection, and to prevent the evils which frequently occur when courts interfere with the normal process of dispute resolution between employers and recognized employee organizations." (Code Civ. Proc., § 527.3,

9

subd. (a).)  It provides that certain activities undertaken during a labor dispute are legal and cannot be enjoined.  (*Id.*, § 527.3, subd. (b).)  Those activities are:

"(1) Giving publicity to, and obtaining or communicating information regarding the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling any public street or any place where any person or persons may lawfully be, or by any other method not involving fraud, violence or breach of the peace.

"(2) Peaceful picketing or patrolling involving any labor dispute, whether engaged in singly or in numbers.

"(3) Assembling peaceably to do any of the acts specified in paragraphs (1) and (2) or to promote lawful interests."  (Code Civ. Proc., § 527.3, subd. (b).)

Expressly excluded from the Moscone Act's protection, however, is "conduct that is unlawful including breach of the peace, disorderly conduct, the unlawful blocking of access or egress to premises where a labor dispute exists, or other similar unlawful activity."  (Code Civ. Proc., § 527.3, subd. (e).)

*2.  Section 1138.1*

Enacted by the California Legislature in 1999 (Stats. 1999, ch. 616, § 1, pp. 4343-4345), section 1138.1 was patterned after section 107 of title 29 of the United States Code; the federal provision is part of the federal Norris-LaGuardia Act.  Section 1138.1 prohibits a court from issuing an injunction during a labor dispute unless, based upon witness testimony that is given in open court and is subject to cross-examination, the court finds each of these facts:

"(1) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or

10

organization making the threat or committing the unlawful act or actually authoriz[ing] those acts.

"(2) That substantial and irreparable injury to complainant's property will follow.

"(3) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief.

"(4) That complainant has no adequate remedy at law.

"(5) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection." (§ 1138.1, subd. (a).)

### 3. *Application to labor picketing at retail store entrances*

As mentioned earlier (see pp. 10-11, *ante*), the Moscone Act declares that certain specified activities during a labor dispute are legal and cannot be enjoined. (Code Civ. Proc., § 527.3, subd. (b).) Among those activities are "patrolling any public street or *any place where any person or persons may lawfully be*" (*id.*, subd. (b)(1), italics added) and "[p]eaceful picketing or patrolling" (*id.*, subd. (b)(2)). Our 1979 decision in *Sears*, *supra*, 25 Cal.3d 317, considered whether these provisions covered picketing on a privately owned walkway in front of a store's customer entrance, thereby exempting peaceful labor picketing of a targeted business from the laws of trespass. Before discussing our resolution of that issue in *Sears*, however, it will be useful to review some of this court's earlier decisions.

Since at least 1964, when this court decided *Schwartz-Torrance Investment Corp. v. Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766 (*Schwartz-Torrance*), California law has protected the right to engage in labor

11

speech — including picketing, distributing handbills, and other speech activities — on private land in front of a business that is the subject of a labor dispute.

In *Schwartz-Torrance*, this court considered whether the owner of a shopping center was entitled to an injunction barring peaceful union picketing in front of a bakery located in the shopping center.  We recognized that under California law a labor union has a right to engage in peaceful picketing on a private sidewalk in front of the business being targeted.  Although our opinion noted that labor picketing is a form of speech and cited decisions of the United States Supreme Court construing the freedom of speech guarantee of the federal Constitution's First Amendment (*Schwartz-Torrance*, *supra*, 61 Cal.2d at pp. 769-771), our holding ultimately was based not on federal constitutional law but on an analysis grounded in California labor law.

In *Schwartz-Torrance*, we began by characterizing the issue presented as "one of accommodating conflicting interests:  plaintiff's assertion of its right to the exclusive use of the shopping center premises to which the public in general has been invited as against the union's right of communication of its position which, it asserts, rests upon public policy and constitutional protection."  (*Schwartz-Torrance*, *supra*, 61 Cal.2d at p. 768.)  Considering first the union's interest, we stated that "[p]icketing by a labor union constitutes an integral component of the process of collective bargaining . . . ."  (*Id.* at p. 768.)  Citing Labor Code section 923, we stated that "[t]he Legislature has expressly declared that the public policy of California favors concerted activities of employees for the purpose of collective bargaining or other mutual aid or protection."  (*Schwartz-Torrance*, at p. 769.)  Citing Penal Code section 552.1, we added that "the Legislature has enacted this policy into an exception to the criminal trespass law."  (*Schwartz-Torrance*, at p. 769.)  Thus, we concluded, " 'the Legislature in dealing with trespasses . . . has specifically subordinated the rights of the property owner to those of persons

12

engaging in lawful labor activities.' " (*Ibid.*, quoting *In re Zerbe* (1964) 60 Cal.2d 666, 668.) "Nor is the union's interest in picketing diminished," we added, "because it may communicate its message at other, admittedly less advantageous, locations off plaintiff's premises." (*Schwartz-Torrance*, at p. 770.)

Turning to the property owner's interest, we said in *Schwartz-Torrance* that it "emanates from the exclusive possession and enjoyment of private property." (*Schwartz-Torrance*, *supra*, 61 Cal.2d at p. 771.) For land being used as a shopping center, however, the impairment of that interest resulting from peaceful labor picketing, was "largely theoretical" in view of the "public character of the shopping center." (*Ibid.*) Quoting the United States Supreme Court, we said: " 'The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.' " (*Ibid.*, quoting *Marsh v. Alabama* (1946) 326 U.S. 501, 506.) Thus, the plaintiff property owner "suffers no significant harm in the deprivation of absolute power to prohibit peaceful picketing upon property to which it has invited the entire public." (*Schwartz-Torrance*, *supra*, 61 Cal.2d at p. 771.) We concluded in *Schwartz-Torrance* that the defendant union's interest in communicating its message through peaceful picketing outweighed the plaintiff shopping center owner's interest in preventing a "theoretical invasion of its right to exclusive control and possession of private property." (*Id.* at p. 772.)

After reviewing sister-state decisions cited by the parties in *Schwartz-Torrance*, we summarized our holding in these terms: "[T]he picketing in the present case cannot be adjudged in the terms of absolute property rights; it must be considered as part of the law of labor relations, and a balance cast between the opposing interests of the union and the lessor of the shopping center. The prohibition of the picketing would in substance deprive the union of the

opportunity to conduct its picketing at the most effective point of persuasion: the place of the involved business. The interest of the union thus rests upon the solid substance of public policy and constitutional right; the interest of the plaintiff lies in the shadow cast by a property right worn thin by public usage." (*Schwartz-Torrance*, *supra*, 61 Cal.2d at pp. 774-775.)

Five years later, we again considered issues concerning labor picketing on private property in front of a retail store's entrance in *In re Lane* (1969) 71 Cal.2d 872 (*Lane*). There, a labor union officer was convicted of two misdemeanor offenses for continuing to distribute handbills on a privately owned sidewalk in front of customer entrances to a supermarket after the store's owner insisted that he leave. (*Id.* at pp. 872-874.) The handbills urged customers not to patronize the supermarket because it advertised in newspapers owned by an individual with whom the union was engaged in a labor dispute. (*Id.* at p. 873.) On the union officer's petition for a writ of habeas corpus, we granted relief, ordering that he be discharged from custody. (*Id.* at p. 879.)

*Lane* rested on our decision in *Schwartz-Torrance*, *supra*, 61 Cal.2d 766, and on the United States Supreme Court's decision in *Amalgamated Food Emp. Union Local 590 v. Logan Valley Plaza* (1968) 391 U.S. 308 (*Logan Valley*), which held that the freedom of speech guarantee of the federal Constitution's First Amendment protected peaceful labor picketing of a business that was located in a shopping center and employed nonunion workers. (*Lane*, *supra*, 71 Cal.2d at pp. 874-878.) Concluding that *Schwartz-Torrance* and *Logan Valley* were consistent with each other, we stated in *Lane*: "In essence they hold that when a business establishment invites the public generally to patronize its store and in doing so to traverse a sidewalk opened for access by the public[,] the fact of private ownership of the sidewalk does not operate to strip the members of the public of their rights to exercise First Amendment privileges on the sidewalk at or

14

near the place of entry to the establishment." (*Lane*, at p. 878.) Although the supermarket in *Lane* was not located in a shopping center, we did not attach any significance to that fact.

Three years later, in *Lloyd Corp. v. Tanner* (1972) 407 U.S. 551 (*Tanner*), the United States Supreme Court modified its view of the federal Constitution's protection for free speech activities on private property, holding that a privately owned shopping center could prohibit the distribution of handbills expressing political views unrelated to the business of the center. The high court in *Tanner* distinguished its earlier decision in *Logan Valley*, *supra*, 391 U.S. 308, on the ground that the latter involved labor speech that was related to one of the businesses located in the shopping center. (*Tanner*, at p. 563.) Thereafter, in a case applying the high court's decision in *Tanner*, we noted that our decisions in *Schwartz-Torrance*, *supra*, 61 Cal.2d 766, and in *Lane*, *supra*, 71 Cal.2d 872, were likewise distinguishable from *Tanner* as involving labor picketing of businesses with which the unions had a labor dispute. (*Diamond v. Bland*, *supra*, 11 Cal.3d 331, 334, fn. 3.)

Four years after its 1972 decision in *Tanner*, *supra*, 407 U.S. 551, the United States Supreme Court extended the holding of that case to encompass labor-related speech, overruling its 1968 decision in *Logan Valley*, *supra*, 391 U.S. 308. (*Hudgens v. NLRB* (1976) 424 U.S. 507.) Thus, the free speech guarantee of the federal Constitution's First Amendment, as currently construed by the nation's high court, does not extend to speech activities on privately owned sidewalks in front of the entrances to stores, whether or not those stores are located in shopping centers and whether or not the speech pertains to a labor dispute.

In 1979, this court again considered the subject of labor speech on private property in a case involving a trial court's injunction prohibiting union picketing "on the privately owned sidewalks surrounding the Sears Chula Vista store even

15

though the picketing was peaceful and did not interfere with access to the store." (*Sears*, *supra*, 25 Cal.3d 317, 321 (plur. opn. of Tobriner, J.).) In overturning the injunction, the three-justice lead opinion relied on California's Moscone Act. The *Sears* plurality stated: "Although the reach of the Moscone Act may in some respects be unclear, its language leaves no doubt but that the Legislature intended to insulate from the court's injunctive power all union activity which, under prior California decisions, has been declared to be 'lawful activity.' " (*Sears*, at p. 323 (plur. opn. of Tobriner, J.), italics omitted.)

The plurality in *Sears* stated that the language of the Moscone Act's subdivision (b), "although broad and sweeping in scope and purpose, leaves some doubt respecting its application to the present context." (*Sears*, *supra*, 25 Cal.3d at p. 324 (plur. opn. of Tobriner, J.).) That doubt centered on the provision declaring to be legal, and not subject to injunctive relief, the patrolling of "any place where any person or persons may lawfully be." (Code Civ. Proc., § 527.3, subd. (b)(2).) The plurality found guidance in "the concluding clause of [the Moscone Act's] subdivision (a)," providing that " 'the provisions of subdivision (b) . . . shall be strictly construed in accordance with existing law governing labor disputes with the purpose of avoiding any unnecessary judicial interference in labor disputes.' " (*Sears*, at p. 325 (plur. opn. of Tobriner, J.), quoting Code Civ. Proc., § 527.3, subd. (a).) This "existing law governing labor disputes," the *Sears* plurality explained, encompassed *Schwartz-Torrance*, *supra*, 61 Cal.2d 766, and *Lane*, *supra*, 71 Cal.2d 872, decisions that had "not been overruled or eroded in later cases" and that "established the legality of union picketing on private sidewalks outside a store as a matter of state labor law." (*Sears*, at p. 328 (plur. opn. of Tobriner, J.).)

The *Sears* plurality then explained its conclusion about the proper construction of the Moscone Act: "As we noted earlier, subdivision (a) of the

16

Moscone Act requires the anti-injunction provisions of subdivision (b) to 'be strictly construed in accordance with existing law governing labor disputes with the purpose of avoiding any unnecessary judicial interference in labor disputes.' " (*Sears*, *supra*, 25 Cal.3d at p. 329 (plur. opn. of Tobriner, J.).) Construing subdivision (b) in accord with the holdings of *Schwartz-Torrance*, *supra*, 61 Cal.2d 766, and *Lane*, *supra*, 71 Cal.2d 872, which had established both "the legality of peaceful picketing on private walkways outside a store" and "the lack of necessity of judicial interference to protect any substantial right of the landowner," the *Sears* plurality concluded that the Moscone Act's subdivision (b) "bars the injunction issued in the instant case." (*Sears*, at p. 329 (plur. opn. of Tobriner, J.).)[1]

### 4. *Validity under the federal Constitution*

In concluding that our state law's Moscone Act and section 1138.1 violate the federal Constitution, the Court of Appeal here relied on two United States Supreme Court decisions, *Police Department of Chicago v. Mosley* (1972) 408 U.S. 92 (*Mosley*) and *Carey v. Brown* (1980) 447 U.S. 455 (*Carey*). Those decisions are distinguishable, however, as both involved laws that restricted speech in a public forum; by contrast, neither the Moscone Act nor section 1138.1

---

[1] In *Sears*, Justice Newman authored a separate opinion consisting of just two sentences: "I agree that the injunction order should be reversed, and I concur in nearly all of Justice Tobriner's reasoning. He detects in the Moscone Act, however, certain ambiguities that to me do not seem to be confounding; and, unlike him, I do not believe that 'the Legislature . . . intended the courts to continue to follow [all] principles of California labor law extant at the time of the enactment of section 527.3.' (Maj. opn., *ante*, at p. 330.)" (*Sears*, *supra*, 25 Cal.3d at p. 333 (conc. opn. of Newman, J.).) Thus, in *Sears* Justice Newman apparently agreed with the plurality that under the Moscone Act, a labor union's peaceful picketing on a private sidewalk outside the entrance of a business that is the subject of a labor dispute is legal and may not be enjoined.

17

restricts speech, and the speech at issue here occurred on private property that is not a public forum for purposes of the federal Constitution's free speech guarantee (*Hudgens v. NLRB*, *supra*, 424 U.S. 507; *Tanner*, *supra*, 407 U.S. 551).

In *Mosley*, a Chicago ordinance prohibited picketing " 'on a public way' " near a primary or secondary school, while the school was in session, but the ordinance permitted peaceful picketing regarding a labor dispute at the school. (*Mosley*, *supra*, 408 U.S. at pp. 92-93.) The United States Supreme Court concluded that the ordinance violated the federal Constitution's equal protection guarantee. Stating that "the First Amendment means that government has no power to *restrict* expression because of its message, its ideas, its subject matter, or its content" (*Mosley*, at p. 95, italics added), the high court concluded that "[s]elective *exclusions from a public forum* may not be based on content alone, and may not be justified by reference to content alone" (*id.* at p. 96, italics added).

In *Carey*, an Illinois statute made it illegal " 'to picket before or about the residence or dwelling of any person,' " with an exception for " 'peaceful picketing of a place of employment involved in a labor dispute.' " (*Carey*, *supra*, 447 U.S. at p. 457.) Stating that "*in prohibiting peaceful picketing on the public streets and sidewalks* in residential neighborhoods, the Illinois statute regulates expressive conduct that falls within the First Amendment's preserve" (*Cary*, at p. 460, italics added), the United States Supreme Court held the statute to be "constitutionally indistinguishable from the ordinance invalidated in *Mosley*" (*ibid*). The Illinois statute's constitutional flaw, the high court explained, was that it "discriminate[d] between lawful and unlawful conduct based upon the content of the demonstrator's communication" (*ibid.*).

The effect of the high court's decisions in *Mosley* and *Carey* was to invalidate the challenged state and municipal laws, thus removing the general prohibition on picketing near schools in *Mosley* and the general prohibition on

picketing in residential neighborhoods in *Carey*. (*Mosley*, *supra*, 408 U.S. at p. 94; *Carey*, *supra*, 447 U.S. at pp. 458-459; see *Perry Ed. Assn. v. Perry Local Educators' Assn.* (1983) 460 U.S. 37, 54 (dis. opn. of Brennan, J.) ["In *Mosley* and *Carey*, we struck down prohibitions on peaceful picketing in a public forum."].) By contrast, invalidating here the Moscone Act and section 1138.1 would not remove any restrictions on speech or enhance any opportunities for peaceful picketing or protest anywhere, including the privately owned walkway in front of the customer entrance to the College Square Foods Co store. This is because neither the Moscone Act nor section 1138.1 abridges speech.

The high court's decisions in *Mosley* and *Carey* both involved speech on public streets and sidewalks, which are public forums under the federal Constitution's First Amendment. Privately owned walkways in front of retail stores, by contrast, are not First Amendment public forums. (*Hudgens v. NLRB*, *supra*, 424 U.S. 507, 520-521; *Tanner*, *supra*, 407 U.S. 551, 570.) As the United States Supreme Court has said: "The key to [*Mosley* and *Carey*] was the presence of a public forum." (*Perry Ed. Assn. v. Perry Local Educators' Assn.*, *supra*, 460 U.S. at p. 55, fn. omitted.) Because here the walkway in front of the College Square Foods Co store is not a First Amendment public forum, the holdings in *Mosley* and *Carey* do not apply.

As further support for its conclusion that California's Moscone Act and section 1138.1 violate the federal Constitution's First and Fourteenth Amendments, the Court of Appeal here cited the decision of the United States Court of Appeals for the District of Columbia Circuit in *Waremart/N.L.R.B.*, *supra*, 354 F.3d 870. At issue there was a ruling by the National Labor Relations Board that a California supermarket's owner had violated the National Labor Relations Act (29 U.S.C. § 158(a)(1)) when it prohibited union agents from distributing handbills to supermarket customers in the store's privately owned

19

parking lot. In making that ruling, the board had concluded that under California law the supermarket owner did not have a right to exclude union representatives from its property. (*Waremart/N.L.R.B.*, at p. 872.) The board's conclusion was based in part on our state's Moscone Act, as construed by this court in *Sears*, *supra*, 25 Cal.3d 317. The federal appellate court disagreed with the board, holding that "the union organizers had no right under California law to engage in handbilling on the privately-owned parking lot of WinCo's grocery store." (*Waremart/N.L.R.B.*, at p. 876.) Regarding the Moscone Act, the federal appellate court concluded, citing the United States Supreme Court's decisions in *Mosley*, *supra*, 408 U.S. 92, and in *Carey*, *supra*, 447 U.S. 455, that the act "violates the First Amendment to the Constitution" insofar as it extends greater protection to speech regarding a labor dispute than to speech on other subjects. (*Waremart/N.L.R.B.*, at pp. 874-875.)

The analysis of the federal appellate decision in *Waremart/N.L.R.B.*, *supra*, 354 F.3d 870, failed to recognize, however, that, as we explained earlier, neither the Moscone Act nor section 1138.1 of our state law restricts speech. *Waremart/N.L.R.B.*'s analysis also failed to recognize that the United States Supreme Court's decisions in *Mosley*, *supra*, 408 U.S. 92, and *Carey*, *supra*, 447 U.S. 455, both involved laws restricting speech in a public forum, as opposed to the situation here, involving laws that do not restrict speech and are being applied on privately owned property that is not a public forum under the First Amendment. For these reasons, we do not consider *Waremart/N.L.R.B.* persuasive on the issues we address here.

As this court has recognized, the decisions of the United States Supreme Court discussing speech regulations "do *not* require literal or absolute content neutrality, but instead require only that the [content-based] regulation be 'justified' by legitimate concerns that are unrelated to any 'disagreement with the message'

20

conveyed by the speech." (*Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 368; accord, *Fashion Valley Mall, LLC v. National Labor Relations Bd.* (2007) 42 Cal.4th 850, 867; *DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 877.) The state law under which employees and labor unions are entitled to picket on the privately owned area outside the entrance to a shopping center supermarket is justified by the state's interest in promoting collective bargaining to resolve labor disputes, the recognition that union picketing is a component of the collective bargaining process, and the understanding that the area outside the entrance of the targeted business often is "the most effective point of persuasion" (*Schwartz-Torrance*, *supra*, 61 Cal.2d 766, 774). These considerations are unrelated to disagreement with any message that may be conveyed by speech that is not related to a labor dispute with the targeted business.

Moreover, California's Moscone Act and section 1138.1, insofar as they protect labor-related speech in the context of a statutory system of economic regulation of labor relations, are hardly unique. As we have seen (pp. 9-10, *ante*), both provisions are based on the federal Norris-LaGuardia Act. The federal National Labor Relations Act (29 U.S.C. § 151 et seq.; NLRA) likewise provides content-based protections for labor-related speech in private workplaces. Under one of the NLRA's provisions, it is unlawful for an employer to interfere with employees' rights to form or join a union (29 U.S.C. § 158, subd. (a)(1)), and this provision has long been construed to protect an employee's right to speak for or against a union on the employer's premises, even though the employer may prohibit solicitations on other topics (*Republic Aviation Corp. v. NLRB* (1945) 324 U.S. 793). The NLRA expressly protects the right of *employers* to speak on the topic of unionization by providing that "[t]he expressing of any views, argument, or opinion, or the dissemination thereof . . . shall not constitute or be evidence of

21

an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit." (29 U.S.C. § 158, subd. (c).)

Decisions of the United States Supreme Court support the proposition that labor-related speech may be treated differently than speech on other topics. The high court's decisions regarding the legality of secondary boycotts provide an example. In the labor context, the high court has upheld the constitutionality of the NLRA's prohibitions on secondary picketing (*NLRB v. Retail Store Employees Union* (1980) 447 U.S. 607) and secondary boycotts (*International Longshoremen's Assn. v. Allied Intl., Inc.* (1982) 456 U.S. 212). When the high court later held that a secondary boycott by civil rights activists was constitutionally protected speech, it distinguished the NLRA cases on the ground that "[s]econdary boycotts and picketing by labor unions may be prohibited, as part of 'Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife.' " (*NAACP v. Claiborne Hardware Co.* (1982) 458 U.S. 886, 912, quoting *NLRB v. Retail Store Employees Union*, at pp. 617-618 (conc. opn. of Blackmun, J.).)

In another decision, which held that the NLRA does not preempt state court jurisdiction to determine whether a particular dispute over labor picketing should be enjoined, the high court did not suggest that special protections for labor speech would violate a federal constitutional rule mandating content neutrality in all speech regulation. (*Sears, Roebuck and Co. v. San Diego County District Council of Carpenters* (1978) 436 U.S. 180, 199.) In that decision, the court also recognized that the NLRA may exempt certain union activity on private property from state trespass laws. (*Id.* at p. 204.)

Therefore, it is well settled that statutory law — state and federal — may single out labor-related speech for particular protection or regulation, in the

22

context of a statutory system of economic regulation of labor relations, without violating the federal Constitution.

As we have mentioned (p. 9, *ante*), the Moscone Act's purpose is "to promote the rights of workers to engage in concerted activities for the purpose of collective bargaining, picketing or other mutual aid or protection, and to prevent the evils which frequently occur when courts interfere with the normal process of dispute resolution between employers and recognized employee organizations." (Code Civ. Proc., § 527.3, subd. (a).)  As the United States Supreme Court has remarked, in regard to the federal Norris-LaGuardia Act (on which our state's Moscone Act was modeled), the congressional purpose was not only "to protect the rights of [employees] to organize and bargain collectively," but also to "withdraw federal courts from a type of controversy for which many believed they were ill-suited and from participation in which, it was feared, judicial prestige might suffer."  (*Marine Cooks v. Panama S. S. Co.* (1960) 362 U.S. 365, 369, fn. 7.)  These legislative judgments provide a sufficient justification for the provisions of California's Moscone Act and section 1138.1 that single out labor-related speech for special protection from unwarranted judicial interference.

For the reasons given above, we conclude that neither of the two state statutes at issue here — the Moscone Act and section 1138.1 — violates the federal Constitution's general prohibition on content-based speech regulation.

### SUMMARY AND DISPOSITION

A private sidewalk in front of a customer entrance to a retail store in a shopping center is not a public forum for purposes of expressive activity under our state Constitution's liberty-of-speech provision as construed in *Pruneyard*, *supra*, 23 Cal.3d 899.  On the private property of a shopping center, the public forum portion is limited to those areas that have been designed and furnished to permit and encourage the public to congregate and socialize at leisure.

23

California's Moscone Act and section 1138.1 afford both substantive and procedural protections to peaceful union picketing on a private sidewalk outside a targeted retail store during a labor dispute, and such union picketing may not be enjoined on the ground that it constitutes a trespass. The Moscone Act and section 1138.1 do not violate the federal Constitution's free speech or equal protection guarantees on the ground that they give speech regarding a labor dispute greater protection than speech on other subjects.

The Court of Appeal's judgment is reversed and the matter is remanded for further proceedings consistent with this opinion.

KENNARD, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CORRIGAN, J.
LIU, J.

**CONCURRING OPINION BY CANTIL-SAKAUYE, C. J.**

I write separately to address further the rights set forth in the Moscone Act (Code Civ. Proc., § 527.3), to provide guidance to the lower courts and the parties on remand.

As we explained in *Sears, Roebuck & Co. v. San Diego County District Council of Carpenters* (1979) 25 Cal.3d 317 (*Sears*), the Moscone Act was a product of compromise. Although drafted by union attorneys, it was modified at the behest of supporters of management. (*Sears,* at p. 323.) In particular, the bill was amended to provide that the act "shall be strictly construed in accordance with existing law governing labor disputes," and "[i]t is not the intent of this section to permit conduct that is unlawful including breach of the peace, disorderly conduct, the unlawful blocking of access or egress to premises where a labor dispute exists, or other similar unlawful activity." (Sen. Bill No. 743 (1975-1976 Reg. Sess.) § 2, as amended Aug. 26, 1975; see now Code Civ. Proc., § 527.3, subds. (a), (e).) Therefore, in determining the scope of the conduct that is lawful under the Moscone Act, it is necessary to consider not only the rights and limitations expressly set forth in the Act, but also " 'existing law.' " (*Kaplan's Fruit & Produce Co. v. Superior Court* (1979) 26 Cal.3d 60, 77 (*Kaplan's Fruit*).)

It has long been established that labor is entitled to engage in peaceful picketing to advertise its grievances for the purpose of persuading others to labor's cause. (*Hughes v. Superior Court* (1948) 32 Cal.2d 850, 854 [" 'the right to picket

1

peacefully and truthfully is one of organized labor's lawful means of advertising its grievances to the public' "]; *Lisse v. Local Union No. 31* (1935) 2 Cal.2d 312, 319 (*Lisse*) [" ' "the right by all legitimate means — of fair publication, and fair and oral or written persuasion, to induce others interested in or sympathetic to their cause" ' "].) "As it has ever been, the only legitimate objective of picketing thus continues to be the transmission of information to the public, so that the public may know the picketers' grievance and elect to support or reject it." (*International Molders and Allied Workers Union v. Superior Court* (1977) 70 Cal.App.3d 395, 404.)

It follows from these established principles, and is confirmed by the Moscone Act's legislative history, that labor activity with an objective other than communicating labor's grievances and persuading listeners exceeds the right to engage in peaceful picketing within the meaning of the Moscone Act. (See Ops. Cal. Legis. Counsel, No. 16257 (Aug. 4, 1975) Injunctions: Labor Disputes (Sen. Bill No. 743) 5 Assem. J. (1975-1976 Reg. Sess.) p. 9020 ["while it must be peaceful and truthful, picketing or *other* concerted action must also be conducted for a legal purpose, and however orderly the manner in which it is conducted, the illegality of its purpose provides a complete basis for injunctive relief"].) For example, "picketing, wherein the persuasion brought to bear contains a threat of physical violence, is unlawful, and . . . the use of words and an aggregation of pickets which reasonably induce fear of physical molestation may properly be enjoined." (*Pezold v. Amalgamated Meat Cutters and Butcher Workmen of North America* (1942) 54 Cal.App.2d 120, 123.) Labor actions need not, however, carry threats of violence or intimidation to fall outside the protection of the law. Speech or conduct directed toward interference with the owner's business by means other than persuasion of patrons to labor's position also falls outside the rights enunciated in the case law. (See Ops. Cal. Legis. Counsel, No. 16257, *supra*, 5

2

Assem. J. (1975-1976 Reg. Sess.) p. 9021 [existing law permitted limitations on a labor organization's manner of use of a public sidewalk "so that there is neither intimidation nor undue interference with its use by . . . customers"].) For example, patrolling a small area with more signs than reasonably required to publicize the dispute and communicate the picketers' ideas to patrons may have no purpose other than interfering with the owner's business. Similarly, using large signs for the purpose of obscuring potential patrons' view of the owner's signs and displays, is not protected activity. (See *Pezold, supra*, at p. 123 ["it would be stubbornly refusing to admit the obvious not to see in the activities of picketing on many occasions more than the mere expression of ideas"]; see also *Senn v. Tile Layers Protective Union* (1937) 301 U.S. 468, 479 [Wisconsin's "statute provides that the picketing must be peaceful; and that term as used implies not only absence of violence, but absence of any unlawful act. . . . It precludes any form of physical obstruction or interference with the plaintiff's business"]; *M Restaurants, Inc. v. San Francisco Local Joint Executive Board of Culinary Workers* (1981) 124 Cal.App.3d 666, 676 [the activities authorized by the Moscone Act are similar to the activities authorized by Wisconsin's statute].)

These principles also answer an issue we identified in *Sears, supra*, 25 Cal.3d 317, in which we observed that "a strict reading [of the Moscone Act] might appear to authorize picketing in the aisles of the Sears store or even in the private offices of its executives." (*Id*. at p. 325.) Labor is fully able to publicize its message near the entrances to a business; at that location, the picketers will cross paths with everyone who enters the business. Communicating inside the business premises is not only unnecessary, but it would invariably interfere with the business activities being conducted inside and annoy and harass patrons. Therefore, although labor may conduct its activities at the entrance of the business, it may not enter the business to do so.

3

Labor is generally entitled to be at the entrance of a business because that is the most effective point to communicate its grievances with the business to potential patrons. (*Schwartz-Torrance Investment Corp. v. Bakery and Confectionery Workers' Union* (1964) 61 Cal.2d 766, 770-771.) Labor may not, however, use the location in front of the business to communicate with a distant audience if the size of its signs or the volume of its speech thereby repel patrons from the business. At the point at which the signs and the sound levels interfere with the business for reasons other than their persuasive message, the communication is no longer lawful. Labor must share the space in front of the business with patrons, and may not unduly interfere with their ingress and egress, physically or through other means. (*Kaplan's Fruit, supra*, 26 Cal.3d at p. 78.)

Finally, because the Moscone Act is to be construed "with the purpose of avoiding any unnecessary judicial interference in labor disputes" (Code Civ. Proc., § 527.3, subd. (a)), conflicts between labor's exercise of its right to communicate and an owner's right to have those who engage in conduct that is not protected by the Moscone Act removed from its property will necessarily be addressed initially between the two opposing sides and, perhaps, by law enforcement. (See Lab. Code, § 1138.1, subd. (a)(5) [a prerequisite to injunctive relief in a labor dispute is a showing "[t]hat the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection"].) A business owner will be in a superior position to recognize the impact that labor's conduct may have on its business, independent of the conduct's effect of persuading patrons. For example, the owner will be familiar with its own promotional activities and will be aware of the impact that labor's signs, by virtue of their size, height, or location, will have on those activities. An owner may also learn from its patrons how the labor action is affecting them. Although business owners do not have a right in this context to unilaterally impose reasonable time,

4

place, and manner restrictions on speakers — the standard when the right to speech is based on the existence of a public forum — they may certainly articulate, before any labor action or on an ad hoc basis, rules and policies aimed at curbing labor conduct that exceeds the rights recognized by the Moscone Act. Labor must abide by the owner's rules and policies to the extent required to prevent unlawful interference with the business, despite the fact that the limits imposed by the owner may reduce labor's ability to communicate its message. Otherwise, the conduct will exceed the rights codified in the Moscone Act.

We recognized in *Lisse, supra*, 2 Cal.2d 312, that " 'whether picketing is lawful or unlawful depends upon the circumstances surrounding each case . . . [and] upon the conduct of the parties themselves.' " (*Id*. at p. 321.)  A trial court must weigh all the evidence and determine whether the conduct of those engaging in labor speech is detrimental to the owner for reasons other than persuasion of listeners to the views of the speaker.  Although the owner's rules do not define the boundaries of what constitutes lawful labor conduct, the owner's experience and knowledge with respect to its business and the manner in which the labor conduct is affecting its business, all of which presumably form the basis for the owner's rules, will be relevant to the court's determination of whether the labor activity is interfering with the business in ways other than persuasion by labor's message.  If the evidence presented by the owner establishes such interference, labor's conduct will not be protected by the Moscone Act, and will constitute an unlawful trespass.

Finally, our discussion concerns only the rights codified in the Moscone Act.  When labor interests engage in concerted activities on public property, they enjoy all of the protections of the National Labor Relations Act (29 U.S.C. § 151 et seq.; NLRA)  And when they engage in speech in a public forum as recognized in *Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899, they enjoy the same speech rights afforded others under the California Constitution, subject to

5

any restrictions imposed by federal labor law.  When, however, they engage in speech on private property that is not a public forum, as in this case, their rights arise from California statutory provisions, and the extent of their rights depends on the principles codified in those provisions.  Principles developed under the NLRA with respect to labor conduct on public property, or in the context of case law addressing speech in a public forum, cannot be applied to expand the right established by the Moscone Act to engage in conduct on private property.  If labor's conduct on private property exceeds the activities that are protected by the Moscone Act, its conduct will constitute an unlawful trespass, and may be excluded by the employer.  (See *N.L.R.B. v. Calkins* (9th Cir. 1999) 187 F.3d 1080, 1094 ["To the extent that state law permits employers' exclusion of [concerted labor activities from private property], the NLRA does not mandate accommodation"].)

CANTIL-SAKAUYE, C. J.

WE CONCUR:

BAXTER, J.
CORRIGAN, J.

**CONCURRING OPINION BY LIU, J.**

I join the court's opinion and write separately to provide additional context in support of the conclusion that the two statutory provisions at issue in this case — Code of Civil Procedure section 527.3 (the Moscone Act) and Labor Code section 1138.1 (section 1138.1) — do not violate the First or Fourteenth Amendments to the United States Constitution. I also briefly discuss the scope of labor activity protected by the Moscone Act in response to the separate opinions of the Chief Justice and Justice Chin.

**I.**

In challenging the constitutionality of the Moscone Act and section 1138.1, Ralphs does not and cannot argue that its own freedom of speech is burdened. Rather, it seeks to assert the First Amendment rights of hypothetical third-party speakers who might like to speak on Ralphs's private property but whose right to do so is not protected by the Moscone Act or section 1138.1. But invalidating those statutes would have no effect on the ability of such hypothetical third parties to speak; Ralphs may eject such speakers from its property under state trespass law whether or not the Moscone Act or section 1138.1 remains on the books. (See maj. opn., *ante*, at p. 19 ["invalidating . . . the Moscone Act and section 1138.1 would not remove any restrictions on speech or enhance any opportunities for peaceful picketing or protest"].)

The crux of Ralphs's First Amendment claim is not an improper denial of speech to anyone, but rather an allegation of content-based discrimination. As

1

Justice Chin notes, the Moscone Act and section 1138.1 secure for "labor picketers, but no one else, . . . the right to engage in speech activities on [Ralphs's] property." (Conc. & dis. opn. by Chin, J., *post*, at p. 2.) The surface appeal of this account of what the statutes do must be considered in the broader context of the statutes' historical origins. As explained below, the Legislature enacted these statutes in order to restrain the role of courts in labor disputes and to promote dispute resolution through collective bargaining, not to burden non-labor speech or to express favoritism for labor speech over other speech. So understood, the statutes are no different from a broad range of labor, employment, and economic regulations that arguably impinge on speech but pose no serious First Amendment concern.

### A.

As today's opinion notes (maj. opn., *ante*, at pp. 9–11), the Moscone Act and section 1138.1 are almost identical to the corresponding provisions of the federal Norris-LaGuardia Act, 29 U.S.C. § 101 et seq. One of Congress's primary goals in enacting the Norris-LaGuardia Act in 1932 was to address the overuse of injunctions in labor disputes. (See Koretz, Statutory History of the United States Labor Organization (1970) pp. 162–257 (Koretz); Frankfurter & Greene, The Labor Injunction (1930) pp. 199–228 (Frankfurter & Greene).) One scholar estimates that federal and state courts issued at least 4,300 injunctions against labor protestors between 1880 and 1930. (Forbath, *The Shaping of the American Labor Movement* (1989) 102 Harv. L.Rev. 1111, 1151.) About 2,100 of these injunctions were issued during the 1920s alone, bringing the proportion of strikes met by injunctions to a high of 25 percent. (*Id.* at p. 1227.) As employers made increasing use of this tool to nip labor disputes in the bud, the labor injunction "assumed new and vast significance in [the] national economy." (Frankfurter & Greene, *supra*, at p. 24.)

2

Many contemporary scholars and legislators were critical of this development.  They observed that labor injunctions were often unnecessary and overbroad; many of the activities enjoined were punishable independently as crimes or torts, and "[t]he blanket wording of numerous [injunctions] frequently include[d] the residuum of conduct even remotely calculated to have effect in the dispute, but neither criminal nor tortious."  (Frankfurter & Greene, *supra*, at p. 105.)  Resort to injunctions meant that juries had no role in checking the exercise of judicial power.  (See Forbath, *supra*, 102 Harv. L.Rev. at p. 1180 ["the 'doing away' with juries was one of the chief attractions of equity over criminal law from the employer's perspective"].)  In addition, injunctions were frequently issued ex parte, without notice, and upon an inadequate evidentiary foundation.  (See Frankfurter & Greene, *supra*, at p. 200 [courts issued "[t]emporary injunctive relief without notice . . . upon dubious affidavits"]; *id.* at p. 106 [the language of injunctions was often "stereotyped and transferred *verbatim* from case to case, without considered application by the court to the peculiar facts of each controversy"]; S. Rep. No. 163, 72d Cong., 1st Sess., p. 8 (1932) [Rep. of U.S. Sen. Com. on Judiciary, on Sen. No. 935: "[B]efore [the protestor] is given an opportunity to be heard, he is enjoined"], reprinted in Koretz, *supra*, at p. 172 (hereafter Senate Judiciary Report).)

Employers' reliance on injunctions was particularly subject to abuse, the critics argued, because the injunctions could not preserve the status quo and suspended only the activities of the strikers:  "[T]he suspension of strike activities, even temporarily, [could] defeat the strike for practical purposes and foredoom its resumption, even if the injunction [was] later lifted," and "[i]mprovident issue of the injunction [could] be irreparable to the defendant."  (Frankfurter & Greene, *supra*, at p. 201.)  Labor injunctions were also "invoked by employers, police, and

3

the press to justify measures like arming strikebreakers or jailing pickets."
(Forbath, *supra*, 102 Harv. L.Rev. at p. 1187.)

The abuse and overuse of injunctive decrees presented serious risks for the judiciary.  Organized labor complained that courts were improperly engaged in "government by injunction."  (Koretz, *supra*, at p. 162 ["For nearly half a century organized labor battled against what it called 'government by injunction' "]; Frankfurter & Greene, *supra*, at p. 200 ["[T]hose zealous for the unimpaired prestige of our courts have observed how the administration of law by decrees which through vast and vague phrases surmount law, undermines the esteem of courts upon which our reign of law depends.  Not government, but 'government by injunction,' characterized by the consequences of a criminal prosecution without its safeguards, has been challenged."].)  The threat to judicial prestige and legitimacy was a major concern motivating Congress's enactment of the Norris-LaGuardia Act.  (See *Marine Cooks v. Panama S. S. Co.* (1960) 362 U.S. 365, 369, fn. 7 [Congress's purpose was "to protect the rights of laboring men to organize and bargain collectively and to withdraw federal courts from a type of controversy for which many believed they were ill-suited and from participation in which, it was feared, judicial prestige might suffer"]; Sen. Judiciary Rep., *supra*, at p. 25, reprinted in Koretz, *supra*, at pp. 192–193 ["The main purpose of these definitions is to provide for limiting the injunctive powers of the Federal courts only in the special type of cases, commonly called labor disputes, in which these powers have been notoriously extended beyond the mere exercise of civil authority and wherein the courts have been converted into policing agencies devoted in the guise of preserving the peace, to the purpose of aiding employers to coerce employees into accepting terms and conditions of employment desired by employers."].)  Indeed, the Senate Judiciary Committee warned that the power to make law through injunction, combined with the power to enforce that law

4

through findings of contempt, would result in "judicial tyranny." (Sen. Judiciary Rep., *supra*, at p. 18, reprinted in Koretz, *supra*, at p. 184.)

In response to these concerns, Senator Shipstead introduced a bill on December 12, 1927 proposing to limit federal courts' jurisdiction over labor disputes. (Sen. Judiciary Rep., *supra*, at p. 2, reprinted in Koretz, *supra*, at p. 169.) Congress held extensive hearings on the subject, some "upon application of attorneys representing corporations and organizations opposed to the enactment" of the legislation (*id.* at 3, reprinted in Koretz, *supra*, at p. 170), and various versions of the bill were vigorously debated. (See Koretz, *supra*, at pp. 240, 242 [Remarks of Rep. Beck, Debate on H.R. No. 5315, 72d Cong., 1st Sess. (1932), arguing that the proposed bill "[would] do infinite harm to both classes, employer and employee, and . . . the innocent public," and criticizing the bill for taking "no account whatever of the motives and purposes with which a nation-wide strike or boycott can be commenced and prosecuted"]; Sen. Judiciary Rep., *supra*, at p. 4, reprinted in Koretz, *supra*, at pp. 170–171 [noting that several versions of the bill were given "adverse report[s]" by the Senate subcommittee]).

But the proposed legislation steadily gained in popularity. The House Judiciary Committee noted that "[h]earings . . . held by congressional committees over a period of years and the facts adduced [had] brought about an almost unanimity of opinion that such powers of the Federal courts [had] been exercised to the detriment of the public welfare and [needed to] be curbed." (H.R. Rep. 669, 72d Cong., 1st Sess., p. 2 (1932) [Rep. of U.S. House Com. on Judiciary, on H.R. No. 5315], reprinted in Koretz, *supra*, at p. 193.) In 1931, both political parties promised legislative reforms in their platforms. (Koretz, *supra*, at p. 172.) The proposed legislation ultimately passed by a vote of 363 to 13 in the House and 75 to 5 in the Senate. (*Id*. at p. 162.) As enacted, the Norris-LaGuardia Act reaffirmed that certain acts of labor organization were lawful (29 U.S.C § 104) and

5

divested federal courts of their equitable power to enjoin labor disputes except under certain limited circumstances and after following specified procedures (29 U.S.C. § 107).

The Norris-LaGuardia Act limits only the power of federal courts to issue injunctions. After its enactment, many state legislatures passed " 'little Norris-LaGuardia Acts' " to place similar restraints on the injunctive powers of state courts. (*Messner v. Journeymen Barbers* (1960) 53 Cal.2d 873, 895, fn. 4 (dis. opn. by Schauer, J.).) California's Moscone Act was one such law. "The original bill, drafted by union attorneys, clearly sought to limit the injunctive jurisdiction of the superior court. The act declared its purpose expressly: to prevent 'the evils which frequently occur when courts interfere with the normal processes of dispute resolution between employers and recognized employee organizations.' " (*Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters* (1979) 25 Cal.3d 317, 323 (*Sears*), quoting Code Civ. Proc., § 527.3, subd. (a).)

As we noted in *Sears*, "[t]he preamble to the Moscone Act identifies the procedural inequities which occur when the courts issue injunctions in labor disputes. It states: [¶] . . . [¶] 'Equity procedure that permits a complaining party to obtain sweeping injunctive relief that is not preceded by or conditioned upon notice to and hearing of the responding party or parties, or that issues after hearing based upon written affidavits alone and not wholly or in part upon examination, confrontation and cross-examination of witnesses in open court, is peculiarly subject to abuse in labor litigation for each of the following reasons: [¶] (a) The status quo cannot be maintained, but is necessarily altered by the injunction. [¶] (b) The determination of issues of veracity and of probability of fact from the affidavits of the opposing parties which are contradictory and, under the circumstances, untrustworthy rather than from oral examination in open court, is subject to grave error. [¶] (c) The error in issuing the injunctive relief is usually

6

irreparable to the opposing party.  [¶] (d) The delay incident to the normal course of appellate procedure frequently makes ultimate correction of error in law or in fact unavailing in the particular case.'  (Stats. 1975, ch. 1156, § 1, p. 2845.)" (*Sears*, *supra*, 25 Cal.3d at p. 323, fn. 2.)

As ultimately enacted in 1975, the Moscone Act "establishe[d] the legality of certain labor practices and limit[ed] the equity jurisdiction of the superior court to enjoin such practices." (*Sears*, *supra*, 25 Cal.3d at p. 322.)  The statute's text is written expressly as a restraint on courts.  Subdivision (a) provides that "the equity jurisdiction of the courts in cases involving or growing out of a labor dispute shall be no broader than as set forth in subdivision (b) of this section, and the provisions of subdivision (b) of this section shall be strictly construed in accordance with existing law governing labor disputes with the purpose of avoiding any unnecessary judicial interference in labor disputes." (Code Civ. Proc., § 527.3, subd. (a).)  Subdivision (b) provides:  "The acts enumerated in this subdivision, whether performed singly or in concert, shall be legal, and no court nor any judge nor judges thereof, shall have jurisdiction to issue any restraining order or preliminary or permanent injunction which, in specific or general terms, prohibits any person or persons, whether singly or in concert, from doing any of the following:  [¶] (1) Giving publicity to, and obtaining or communicating information regarding the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling any public street or any place where any person or persons may lawfully be, or by any other method not involving fraud, violence or breach of the peace.  [¶] (2) Peaceful picketing or patrolling involving any labor dispute, whether engaged in singly or in numbers.  [¶] (3) Assembling peaceably to do any of the acts specified in paragraphs (1) and (2) or to promote lawful interests." (*Id.*, § 527.3, subd. (b).)

7

Fifteen years later, the Legislature enacted section 1138.1, which codified the procedures that must be followed before an injunction will issue. The court must find, among other things, that "unlawful acts have been threatened and will be committed unless restrained"; that "substantial and irreparable injury to complainant's property will follow" in the absence of an injunction; and that "the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection." (Lab. Code, § 1138.1, subd. (a).)

Importantly, the statutory restraints on labor injunctions do not leave employers without a remedy for unlawful activity. Indeed, section 1138.1, subdivision (a)(5) requires the employer to show that "the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection." The existence of this requirement implies that the police are authorized to stop any "unlawful acts" proscribed by the Moscone Act. (See *United Food & Commercial Workers Union v. Superior Court* (2000) 83 Cal.App.4th 566, 578 [section 107 of title 29 of the United States Code, from which section 1138.1 was patterned almost verbatim, " 'was based upon a recognition of the fact that the preservation of order and the protection of property in labor disputes is in the first instance a police problem' "].) In addition, if labor protestors are engaged in unlawful activity that causes the store to lose money, the employer may sue for damages. Section 1138.1 simply limits one form of relief available to the employer based on the Legislature's judgment that court-issued injunctions are a poor method of resolving labor disputes.

In sum, the Moscone Act and section 1138.1, like the federal statute they emulate, were enacted to remedy judicial practices that unfairly proscribed labor speech, not to favor labor speech over other types of expressive conduct.

**B.**

In its brief, Ralphs contends that the statutes violate the principle of content neutrality because they "discriminate in favor of labor speech by exalting labor over all other types of expressive activities." (See also *Waremart Foods v. NLRB* (D.C. Cir. 2004) 354 F.3d 870, 874–875.) But even if this were a proper characterization of the statutes, it is hardly obvious that they run afoul of the First Amendment. The principal cases on which Ralphs relies — *Police Department of Chicago v. Mosley* (1972) 408 U.S. 92 and *Carey v. Brown* (1980) 447 U.S. 455 — involved content-based prohibitions on speech in quintessential public forums. Outside the context of a public forum, the principle of content neutrality, though "frequently . . . identified as the First Amendment's operative core, is neither so pervasive nor so unyielding as is often thought." (Fallon, *Sexual Harassment, Content Neutrality, and the First Amendment Dog That Didn't Bark*, 1994 S.Ct. Rev. 1, 2 (Fallon).) Because "large areas of communication still remain untouched by the First Amendment," the principles governing the First Amendment's applicability to speech regulation cannot be reduced to any simple formula. (Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience* (2004) 117 Harv. L.Rev. 1765, 1800–1801 (Schauer) ["the explanation for what is ultimately treated as covered by the First Amendment and what ultimately remains uncovered appears to be the result of a highly complex array of factors, some of which are doctrinal but many of which are not"].)

To begin with, the "Supreme Court has explicitly recognized several categories [of speech] within which content-based regulation is sometimes permitted, often on a relatively ad hoc basis," including commercial speech, adult speech, libel, broadcast media, speech of government employees, and student speech. (Fallon, *supra*, 1994 S.Ct. Rev. at p. 23; see *id.* at pp. 23–26.) The high

court has further held that some categories of speech, defined on the basis of content, are of such low value that they do not merit First Amendment protection. (*Id.* at p. 23 ["[o]bscenity, fighting words, and child pornography are well-known examples of generally unprotected categories"].)

Moreover, many laws that regulate speech based on its content have never been thought to trigger First Amendment concern. For example, the Securities and Exchange Commission "engages in pervasive content-based control over speech" in regulating securities: it prohibits companies from making offers and advertisements without advance approval, regulates the statements candidates may make in proxy contests, and prohibits the transmission of accurate inside information from "tipper" to "tippee" in the insider trading context. (Schauer, *supra*, 117 Harv. L.Rev. at pp. 1778–1779.) Similarly, "antitrust law restricts the exchange of accurate market, pricing, and production information, as well as limits the advocacy of concerted action in most contexts; yet it remains almost wholly untouched by the First Amendment." (*Id.* at p. 1781, fns. omitted.) "[M]uch the same degree of First Amendment irrelevance holds true for the content-based regulation of trademarks, the pervasive and constitutionally untouched law of fraud, almost all of the regulation of professionals, virtually the entirety of the law of evidence, large segments of tort law, and that vast domain of criminal law that deals with conspiracy and criminal solicitation." (*Id.* at pp. 1783–1784, fns. omitted.) Nor does it violate the First Amendment for government to impose greater punishment for crimes in which the defendant selected the victim because of the victim's race or other protected status. (*Wisconsin v. Mitchell* (1993) 508 U.S. 476, 487 [holding that penalty enhancement statute "is aimed at conduct unprotected by the First Amendment"]; *In re M.S.* (1995) 10 Cal.4th 698, 720–726 [upholding hate crimes statute against First Amendment claim alleging content-based discrimination].)

Scholars surveying this legal landscape have struggled to develop a coherent theory that explains why some regulations impinging on speech trigger First Amendment concern while others do not. Professor Schauer interprets the case law to suggest that the state may criminalize "speech [that] is face-to-face, informational, particular, and for private gain," but not speech that is "public, noninformational, and ideological [in] nature." (Schauer, *supra*, 117 Harv. L.Rev. at pp. 1801, 1802.) Further, he posits that the First Amendment's coverage in the civil context may be partly explained by the existence or absence of a sympathetic class of litigants or a well-entrenched regulatory scheme. (*Id.* at pp. 1803–1807.) Whatever the merits of these views, it is apparent that "the conceptual space covered by the First Amendment is [simply] too vast to yield to a general rule of content neutrality, a categorical prohibition of ad hoc balancing, or any other single formulation." (Fallon, *supra*, 1994 S.Ct. Rev. at p. 22.)

Most pertinent to the case before us, the Supreme Court has consistently rejected First Amendment challenges to content-based speech regulations in the context of labor relations. As today's opinion explains, content-based protections for labor-related speech in private workplaces pervade the federal National Labor Relations Act (NLRA). (Maj. opn., *ante*, at pp. 21–23.) Under 29 United States Code section 158(a)(1), it is unlawful for an employer to interfere with employees' rights to form or join a union, and "this provision has long been construed to protect an employee's right to speak for or against a union on the employer's premises, even though the employer may prohibit solicitations on other topics." (Maj. opn., *ante*, at pp. 21–22, citing *Republic Aviation Corp. v. NLRB* (1945) 324 U.S. 793.) The NLRA also protects the right of employers to speak on unionization by providing that "[t]he expressing of any views, argument, or opinion, or the dissemination thereof . . . shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force

11

or promise of benefit." (29 U.S.C. § 158(c); see also Lab. Code, § 1155 [almost identical language applicable to agricultural employers].)

Similarly, content-based prohibitions on labor-related speech pervade federal and state labor laws. The NLRA makes it unlawful for a union or its agents to engage in speech that "restrain[s] or coerce[s]" employees in their decision to unionize or bargain collectively (29 U.S.C. § 158(b)(1)); "to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services" (*id.*, § 158(b)(4)(i)); or to engage in speech that "threaten[s], coerce[s], or restrain[s] any person" with the object of forcing someone to join a union or forcing someone to cease doing business with another person (*id.*, § 158(b)(4)(ii)(A), (B)). The NLRA also prohibits picketing whose object is to force an employer to recognize a union or to force employees to join a union. (*Id.*, § 158(b)(7).) It further prohibits secondary picketing (*NLRB v. Retail Store Employees Union* (1980) 447 U.S. 607) and secondary boycotts (*International Longshoremen's Assn. v. Allied Intl., Inc.* (1982) 456 U.S. 212) — prohibitions the high court has upheld on the ground that "[s]econdary boycotts and picketing by labor unions may be prohibited, as part of 'Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife.' " (*NAACP v. Claiborne Hardware Co.* (1982) 458 U.S. 886, 912, quoting *NLRB v. Retail Store Employees Union*, at pp. 617–618 (conc. opn. by Blackmun, J.).)

Although these laws arguably favor or disfavor certain kinds of speech on the basis of content, they have never been held to violate the federal Constitution. (See *International Longshoremen's Assn. v. Allied Intl., Inc.*, *supra*, 456 U.S. at p. 226

12

["We have consistently rejected the claim that secondary picketing by labor unions in violation of § 8(b)(4) [of the NLRA] is protected activity under the First Amendment."]; *Hudgens v. NLRB* (1975) 424 U.S. 507, 521 [holding that the "constitutional guarantee of free expression has no part to play in a case such as this" and remanding to the National Labor Relations Board to determine in the first instance the proper accommodation between labor rights and private property rights]; *NLRB v. Gissell Packing Co.* (1969) 395 U.S. 575, 616–620 [holding that interests in fair and peaceful labor relations justify limited restrictions on employers' speech in the context of labor disputes]; *Senn v. Tile Layers Protective Union Local 5* (1937) 301 U.S. 468, 472 [holding that Wisconsin Labor Code provisions authorizing peaceful picketing and publicizing of labor disputes did not violate the due process clause or the equal protection clause of the Fourteenth Amendment].)

Beyond the context of labor-management relations, many federal and state employment laws contain content-based speech protections — for example, whistleblower protections and antiretaliation provisions in civil rights laws. (See, e.g., 29 U.S.C. § 660(c) [making it unlawful to retaliate against an employee who reports a violation of the federal Occupational Safety and Health Act]; 18 U.S.C. § 1514A(a) [protecting employees who report fraud or violations of securities law under the provisions of Sarbanes-Oxley]; 42 U.S.C. § 2000e-3(a) [protecting speech that reports or opposes status-based discrimination, harassment, or retaliation]; Lab. Code § 1102.5 [protecting disclosure of violation of state or federal law].) Federal and state employment laws also contain content-based prohibitions on speech — for example, laws against racial, sexual, or other status-based harassment. (See, e.g., 42 U.S.C. § 2000e-2 [prohibiting status-based harassment]; *Aguilar v. Avis Rent A Car System* (1990) 21 Cal.4th 121, 130 [holding that the Fair Housing and Employment Act prohibits the use of racist epithets in the workplace and does not constitute an improper prior restraint on

13

freedom of expression].)  In California, some laws compel speech based on content, including a provision of the Fair Housing and Employment Act that requires all employers with more than 50 employees to conduct trainings on prohibited discrimination.  (Gov. Code, § 12950.1; 22 Cal. Code Regs., tit. 22, § 7288.0(b).)  Again, these laws have never been struck down on First or Fourteenth Amendment grounds.  (See, e.g., *Harris v. Forklift Systems* (1993) 510 U.S. 17 [upholding imposition of title VII liability for a broad category of sexually harassing speech that creates a hostile work environment].)

Although there may be no single theory that can account for all of the First Amendment jurisprudence discussed above, much of it can perhaps be explained by a distinction between the *economic conduct* at issue and the *expressive content* of that conduct.  This distinction is easy to discern in, say, a law against price fixing.  Such a law prohibits certain kinds of speech based on content, but it does so because it is really targeting a certain kind of economic conduct.  Similarly, the Moscone Act protects certain kinds of speech ("Join our union!" or "Non-union store:  don't shop here!").  But it does so because it aims to promote a certain kind of economic conduct — labor dispute resolution through collective bargaining — that the Legislature believes conducive to its public policy goals for the workplace and the economy.  (See Code Civ. Proc., § 527.3, subd. (a) [Moscone Act aims "to promote the rights of workers to engage in concerted activities for the purpose of collective bargaining, picketing or other mutual aid or protection, and to prevent the evils which frequently occur when courts interfere with the normal processes of dispute resolution between employers and recognized employee organizations"].)  Viewed this way, the Moscone Act and section 1138.1 are not speech regulations but economic regulations that govern the relationship between labor and management.  Like a price-fixing statute, they fall outside the scope of First Amendment concern.  (Cf. *R.A.V. v. St. Paul* (1992) 505 U.S. 377, 389

14

["[S]ince words can in some circumstances violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the Nation's defense secrets), a particular content-based subcategory of a proscribable class of speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech"].)

In sum, a vast array of federal and state employment and labor laws, many of which protect, prohibit, or even compel speech based on its content, has never been held to violate the federal Constitution. The comprehensive regulatory regimes that govern employer-employee relations reflect careful balancing of the interests of labor and management within the context of a legislature's broad economic goals. The Moscone Act and section 1138.1 are part of such a regime, and neither statute violates the First Amendment prohibition on content-based speech regulation.

## II.

As to the scope of substantive rights set forth in the Moscone Act, I offer a few comments in response to the separate opinions of the Chief Justice and Justice Chin.

Justice Chin points out that the NLRA does not compel an employer to allow nonemployee labor organizers onto its business premises unless its employees are otherwise inaccessible. (Conc. & dis. opn. by Chin, J., *post*, at p. 4, citing *Lechmere, Inc. v. NLRB* (1992) 502 U.S. 527, 539.) This is true, but not particularly relevant to the scope of the Moscone Act. As we explained in *Sears*, nothing in federal law "confers on the employer an affirmative right to exclude union pickets unless such picketing constitutes an unfair labor practice." (*Sears*, *supra*, 25 Cal.3d at p. 332; see also *Thunder Basin Coal Co. v. Reich* (1994) 510 U.S. 200, 217, fn. 21 ["The right of employers to exclude union organizers from their private property emanates from state common law, and while this right is not

15

superseded by the NLRA, nothing in the NLRA expressly protects it."]; *NLRB v. Calkins* (9th Cir. 1999) 187 F.3d 1080, 1094 ["State trespass law that does not guarantee the right to exclude causes no conflict [with federal law], in that it does not prohibit federally protected conduct; instead, such law grants broader accommodation of protected conduct than is required by the federal labor law."].) Accordingly, our state law may, and does, grant labor organizers broader rights without conflicting with federal law.

In her concurring opinion, the Chief Justice aims to provide guidance to lower courts and the parties in construing the rights secured by the Moscone Act. She quotes *Pezold v. Amalgamated Meat Cutters and Butcher Workmen of North America* (1942) 54 Cal.App.2d 120, 123, for the proposition that "picketing, wherein the persuasion brought to bear contains a threat of physical violence, is unlawful, and . . . the use of words and an aggregation of pickets which reasonably induce fear of physical molestation may properly be enjoined." (Conc. opn. by Cantil-Sakauye, C.J., *ante*, at p. 2.) This proposition is undoubtedly correct, since acts of physical violence and intimidation are unlawful under the Moscone Act. (See Code Civ. Proc., § 527.3, subd. (e) ["It is not the intent of this section to permit conduct that is unlawful including breach of the peace, disorderly conduct, the unlawful blocking of access or egress to premises where a labor dispute exists, or other similar unlawful activity."].)

However, the remainder of the Chief Justice's analysis gives me pause. The Chief Justice proposes the principle that "labor activity with an objective other than communicating labor's grievances and persuading listeners exceeds the right to engage in peaceful picketing" under the Moscone Act. (Conc. opn. by Cantil-Sakauye, C.J., *ante*, at p. 2.) Although this principle may be sensible in the abstract, I worry it will be difficult to apply in practice. The Chief Justice suggests, for example, that "patrolling a small area with more signs than

16

reasonably required to publicize the dispute" is not protected. (*Id*. at p. 3.)  But if reasonableness is the test, then we must ask reasonable to whom?  Business owners are likely to argue that any labor activity that drives customers away is unreasonable.  Yet the fact that labor activity may dissuade customers from shopping at a store cannot alone be grounds for concluding that the activity unlawfully interferes with the operation of the business.  After all, that is often the whole point of the labor activity authorized by the Moscone Act.  And if customers are in fact driven away, how is a court to determine whether they were driven away out of sympathy with the protesters' cause, out of disgust with the protestors' cause, or out of a desire simply not to be hassled regardless of the protestors' cause?  Whether labor protestors have used "more signs than reasonably required to publicize the dispute" would seem to turn on such difficult inquiries.

The Chief Justice also suggests that signs larger than a certain size may be prohibited.  (Conc. opn. by Cantil-Sakauye, C.J., *ante*, at pp. 3, 4.)  But it is not clear how courts would determine what sign size would be permissible in various contexts.  While it may be true that large signs (what is large?) are not strictly necessary to convey the basic message of a labor protest, it is also true that larger signs are likely more effective in conveying that message.  At what point does a court say that the communicative value of a marginally more effective form of protest is outweighed by the incremental potential for interference with the business?  Answering this question becomes particularly difficult when a case involves nontraditional forms of protest designed to have an emotional impact on the intended audience.  For example, unions have protested what they consider to be unfair labor practices by staging mock funerals or inflating giant rat balloons near the entrance of the target establishment.  (See Rakoczy, *On Mock Funerals, Banners, and Giant Rat Balloons: Why Current Interpretation of Section*

17

*8(b)(4)(ii)(B) of the National Labor Relations Act Unconstitutionally Burdens Union Speech* (2007) 56 Am. U. L.Rev. 1621, 1623.) Again, while such tactics may not be necessary to convey protestors' basic message, they are likely more effective at capturing patrons' attention and creating a lasting impression.

Of course, we can assign to ourselves and the lower courts the task of making case-by-case judgments as to what is "reasonable." The task would involve balancing labor's communication interests against management's economic interests in each case. But such balancing, done under the auspices of construing a statute, seems to contemplate a rather substantial degree of ad hoc judicial policy-making. Moreover, the balancing inquiry will, I fear, serve as a standing invitation for litigants to draw courts into the business of resolving labor disputes — which is precisely what the Legislature sought to prevent by passing the Moscone Act. (See *ante*, at pp. 6–7.)

In determining what is lawful protest activity under the Moscone Act, I believe courts should hew closely to the text of the Moscone Act itself. The statute provides that the following activities "shall be legal": (1) "[g]iving publicity to" the existence of a labor dispute by "any . . . method not involving fraud, violence or breach of the peace"; (2) "[p]eaceful picketing or patrolling involving any labor dispute"; and (3) "[a]ssembling peaceably" to do the activities outlined in paragraphs (1) and (2). (Code Civ. Proc., § 527.3, subd. (b).) The statutory text contains several built-in limitations on legal protest activities: The activities must be peaceful. They must not involve fraud, violence, or breach of the peace. And, as subdivision (e) provides, "[i]t is not the intent of this section to permit conduct that is unlawful including breach of the peace, disorderly conduct, the unlawful blocking of access or egress to premises where a labor dispute exists, or other similar unlawful activity." (*Id.*, subd. (e).) Thus, the text of the Moscone Act itself defines what activities unlawfully interfere with the conduct of the business and proscribes such activities. Courts should tightly

18

tether the "lawfulness" inquiry to the statutory text in order to avoid the hazards of judicial policymaking and excessive involvement in labor disputes.

Finally, the Chief Justice notes that a business "owner will be familiar with its own promotional activities and will be aware of the impact that labor's signs, by virtue of their size, height, or location, will have on those activities." (Conc. opn. by Cantil-Sakauye, C.J., *ante*, at p. 4.) Because of that familiarity, the Chief Justice says, business owners "may certainly articulate, before any labor action or on an ad hoc basis, rules and policies aimed at curbing labor conduct that exceeds the rights recognized by the Moscone Act. Labor must abide by the owner's rules and policies to the extent required to prevent unlawful interference with the business, despite the fact that the limits imposed by the owner may reduce labor's ability to communicate its message." (*Id.* at p. 5.)

I am not sure what to make of this passage. A business can certainly adopt whatever restrictions it deems best for its own interests. But I do not see how "rules and policies" adopted by a business owner carry any weight in resolving what activities are "lawful" under the Moscone Act, beyond the weight of the evidence introduced by the business owner to demonstrate an unlawful interference with the business. Any suggestion that courts should defer to restrictions imposed by a business owner or treat such restrictions as a starting point for assessing what is lawful finds no support in the Moscone Act. The statute does not mention such restrictions or remotely hint that labor picketers must adhere to such restrictions. Although a business owner is entitled to introduce evidence that a labor protest is obstructing patrons' access or egress to the store or is otherwise fraudulent, violent, or disorderly, the fact that a business has codified its desired restrictions into a set of "rules and policies" has no independent bearing on the legal analysis.

In sum, the text of the Moscone Act provides storeowners with important protections from unreasonable interference with their business operations. Judicial

19

restraint — the very principle that the Legislature sought to enforce by passing the Moscone Act (see *ante*, at pp. 6–7) — counsels that courts, in determining what is lawful protest activity, should avoid ad hoc balancing and should instead evaluate the conduct at issue against the terms of the statute itself.

LIU, J.

I CONCUR:

WERDEGAR, J.

**CONCURRING AND DISSENTING OPINION BY CHIN, J.**


I agree with the majority that the privately owned walkway in front of the customer entrance to the grocery store is not a public forum under *Fashion Valley Mall, LLC v. National Labor Relations Bd.* (2007) 42 Cal.4th 850 (*Fashion Valley*) and *Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899. (Maj. opn., *ante*, at pp. 5-9.) I also agree that cases such as *Van v. Target Corp.* (2007) 155 Cal.App.4th 1375 and *Albertson's, Inc. v. Young* (2003) 107 Cal.App.4th 106 correctly allowed the store owners of those cases to bar speech activities on their premises. (Maj. opn., *ante*, at pp. 7-8; see *Fashion Valley*, *supra*, at p. 880 (dis. opn. of Chin, J.).) The majority opinion also implicitly reaffirms the correctness of a series of decisions holding that antiabortion protesters have no right to engage in speech activities on the privately owned parking lots and walkways of medical clinics that provide abortion services. (*Feminist Women's Health Center v. Blythe* (1995) 32 Cal.App.4th 1641; *Allred v. Harris* (1993) 14 Cal.App.4th 1386; *Planned Parenthood v. Wilson* (1991) 234 Cal.App.3d 1662; *Allred v. Shawley* (1991) 232 Cal.App.3d 1489; see *Waremart Foods v. N.L.R.B.* (D.C. Cir. 2004) 354 F.3d 870, 876 (*Waremart*).)

But I cannot agree with the majority's interpretation of the Moscone Act (Code Civ. Proc., § 527.3) and Labor Code section 1138.1 (hereafter, collectively, the Moscone Act), and its conclusion that both provisions are constitutional. (But, given the majority opinion, I do agree with the cautionary comments regarding the

1

scope of the Moscone Act in the Chief Justice's concurring opinion.) These statutory provisions are probably constitutional on their face. But the difficult questions are *how* they should be applied and whether they are valid *as applied*.

When it denied injunctive relief, the trial court believed that the entrance to the store was a public forum under California law. As the majority holds, the trial court erred in this respect. It is not clear what the court would have done had it correctly found the property not to be a public forum. What is clear is that the decision facing the trial court would have been quite different. Rather than decide difficult statutory and constitutional questions in a vacuum — and rely primarily in so doing on old California cases decided under a legal landscape that is now obsolete (see *Fashion Valley*, *supra*, 42 Cal.4th at p. 880 (dis. opn. of Chin, J.)) — we should instead remand the matter to the trial court to reconsider the matter with a correct understanding of California's public forum law. Only on a concrete record following a trial court decision free of legal error should we attempt to decide the remaining questions.

Allowing labor picketers to picket at the entrance to the grocery store — along with the majority's reaffirmation of the Court of Appeal decisions denying free speech rights to others on similar private property — means that labor picketers, but no one else, have the right to engage in speech activities on that property. As applied to medical clinics, it apparently means, for example, that nurses can picket on clinics' parking lots and walkways — including, presumably, protesting against being required to aid in providing abortion services — but antiabortion protesters, and others with their own message, may not do so. To

2

discriminate in this way based on the content of the speech, or who the speaker is, raises serious constitutional questions.[1]

Today's opinion places California on a collision course with the federal courts. As the majority recognizes, the *Waremart* court held that permitting labor speech, but not other speech, on private property would violate the United States Constitution as interpreted in *Carey v. Brown* (1980) 447 U.S. 455 (statute prohibiting picketing at private homes but excepting from the prohibition picketing involving a labor dispute is unconstitutional) and *Police Department of Chicago v. Mosley* (1972) 408 U.S. 92 (ordinance prohibiting picketing near schools but excepting from the prohibition picketing related to a labor dispute is unconstitutional). (*Waremart*, *supra*, 354 F.3d at pp. 874-875.) Although only the United States Supreme Court can definitively resolve the disagreement between the majority and the *Waremart* court, the *Waremart* court was not clearly wrong.

The majority claims its interpretation of the Moscone Act is valid because the act does not limit free speech. (Maj. opn., *ante*, at pp. 17-19.) It is true that the Moscone Act, itself, does not limit speech. But the Court of Appeal cases involving nonlabor speech at stores and medical clinics, which the majority purports to reaffirm, *do* limit speech. Thus, the majority upholds content-based discrimination between labor and nonlabor speech, which presents the difficult constitutional question the *Waremart* court identified. Additionally, the majority appears to find no constitutional violation because the Moscone Act merely

---

[1] The plurality opinion in *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters* (1979) 25 Cal.3d 317, on which the majority heavily relies, did not consider this constitutional question or whether it should follow the precept that a court considering a statute that raises serious constitutional questions should strive to interpret that statute in a way that avoids any doubt concerning its validity. (See *Young v. Haines* (1986) 41 Cal.3d 883, 898.)

3

protects "labor-related speech in the context of a statutory system of economic regulation of labor relations." (Maj. opn., *ante*, at p. 21.) Perhaps. But on this incomplete record, it is not clear to me that the high court would permit content-based discrimination on this ground. At the least, before deciding this question, we should have before us the trial court's ruling incorporating the correct understanding that the property at issue is not a public forum. We should know, and consider, exactly what economic or labor interests are actually at stake.

Under federal law, labor organizers have no right to contact employees on private property "unless the employees are otherwise inaccessible." (*Lechmere, Inc. v. NLRB* (1992) 502 U.S. 527, 534 [interpreting the National Labor Relations Act].) The record in this case indicates that to the left of the store entrance, as one faces it, is a courtyard area with benches that the shopping center maintains. The point was not developed at trial, but it appears likely that this courtyard area is a public forum under the majority opinion in *Fashion Valley*, *supra*, 42 Cal.4th 850. (I dissented in *Fashion Valley*, but I recognize that it now represents the law in California.) If this is correct, labor picketers (and others) could present their message next to the store, meaning that neither the store nor its employees are inaccessible to anyone. (See *Lechmere, Inc. v. NLRB*, *supra*, at pp. 529, 541 [labor organizers had no right to enter private property to present their message when suitable public property was available nearby].) Given the seemingly slight difference between picketing next to the store and at its entrance, it is far from clear to me that the high court would permit California to discriminate in this way between labor-related speech and all other speech.

We should remand the matter to the Court of Appeal with directions to remand it back to the trial court to reconsider its ruling in light of this court's holding that the entrance walkway in front of the store is not a public forum.

4

Then, and only then, should we decide the remaining statutory and constitutional questions based on a full and concrete record.

CHIN, J.

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Ralphs Grocery Company v. United Food and Commercial Workers Union Local 8
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 186 Cal.App.4th 1078
**Rehearing Granted**

_____

**Opinion No.** S185544
**Date Filed:** December 27, 2012
_____

**Court:** Superior
**County:** Sacramento
**Judge:** Loren E. McMaster

_____

**Counsel:**

Morrison & Foerster, Miriam A. Vogel, Timothy F. Ryan and Tritia M. Murata for Plaintiff and Appellant.

Littler Mendelson, William J. Emanuel and Natalie Rainforth for Employers Group, California Grocers Association and California Hospital Association as Amici Curiae on behalf of Plaintiff and Appellant.

Jones Day, Willis J. Goldsmith, Amanda M. Betman, Craig E. Stewart; National Chamber Litigation Center, Inc., Robin S. Conrad and Shane B. Kawka for Chamber of Commerce of the United States of America as Amicus Curiae on behalf of Plaintiff and Appellant.

Manatt, Phelps & Phillips, Michael M. Berger and Matthew P. Kanny for California Retailers Association, California Business Properties Association and International Council of Shopping Centers as Amici Curiae on behalf of Plaintiff and Appellant.

Davis, Cowell & Bowe, Richard G. McCracken, Steven L. Stemerman, Elizabeth A. Lawrence, Andrew J. Kahn, Paul L. More, Sarah Grossman-Swenson for Defendant and Respondent.

David L. Llewellyn, Jr., for the Missionary Church of the Disciples of Jesus Christ as Amicus Curiae on behalf of Defendant and Respondent.

Judith A. Scott; Altshuler Berzon, Stephen P. Berzon, Scott A. Kronland and P. Casey Pitts for Service Employees International Union as Amicus Curiae on behalf of Defendant and Respondent.

Lynn Rhinehart, James B. Coppess; Altshuler Berzon and Michael Rubin for American Federation of Labor and Congress of Industrial Organizations as Amicus Curiae on behalf of Defendant and Respondent.

Alan L. Schlosser for American Civil Liberties Union of Northern California as Amicus Curiae on behalf of Defendant and Respondent.

Catherine L. Fisk for Labor Law Professors as Amicus Curiae on behalf of Defendant and Respondent.

**Page 2 – S185544 – counsel continued**

**Counsel:**

Reich, Adell & Cvitan and J. David Sackman for Korean Immigrant Workers Alliance as Amicus Curiae on behalf of Defendant and Respondent.

DeCarlo, Connor & Shanley and Daniel M. Shanley for Southwest Regional Council of Carpenters as Amicus Curiae on behalf of Defendant and Respondent.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Manuel M. Medeiros, State Solicitor General, J. Matthew Rodriquez, Chief Assistant Attorney General, Louis Verdugo, Jr., Assistant Attorney General, Angela Sierra and Antonette Benita Cordero, Deputy Attorneys General, as Amici Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Miriam A. Vogel
Morrison & Foerster
555 West Fifth Street, Suite 3500
Los Angeles, CA  90013-1024
(213) 892-5200

Paul L. More
Davis, Cowell & Bowe
595 Market Street, Suite 1400
San Francisco, CA  94105
(415) 597-7200